| INVOICE | DATE BILLED | AMOUNT | DATE DEBTORS' ACCT. CREDITED | #–DAYS |
|---|---|---|---|---|
| 13586 | 10–24–86 | 1,570.48 | 11–06–86 | 13 |
| 13625 | 11–19–86 | 6,465.30 | 12–08–86 | 19 |
| 13626 | 11–21–86 | 9,902.45 | 12–08–86 | 17 |
| 13639 | 12–04–86 | 2,679.30 | 12–18–86 | 14 |
| 13660 | 12–12–86 | 6,398.00 | 01–02–87 | 21 |
| 13711 | 01–19–87 | 1,151.85 | 02–05–87 | 17 |
| 14037 | 08–31–87 | 12,620.50 | 09–11–87 | 11 |
| 14151 | 10–20–87 | 11,235.42 | 11–09–87 | 20 |
| 14267 | 12–16–87 | 13,850.67 | 12–31–87 | 15 |
| 14274 | 12–18–87 | 12,727.43 | 01–11–88 | 24 |
| 14296 | 01–11–88 | 12,224.84 | 01–26–88 | 15 |
| 14361 | 02–04–88 | 12,584.54 | 02–24–88 | 20 |
| 14475 | 03–31–88 | 13,018.43 | 04–14–88 | 14 |
| 14517 | 04–14–88 | 13,458.61 | 04–27–88 | 13 |
| 14567 | 05–11–88 | 11,361.05 | 06–13–88 | 33 |
| 14589 | 05–18–88 | 12,783.60 | 06–18–88 | 31 |
| 14604 | 05–24–88 | 11,916.54 | 06–18–88 | 25 |
| 14661 | 06–27–88 | 12,578.41 | 07–09–88 | 12 |
| 14717 | 07–15–88 | 12,369.53 | 07–29–88 | 14 |

**In re John S. TRINSEY, Jr., Debtor.**

**Maurice W. BAEHR, Trustee,**
v.
**James BEASLEY, Esquire, and Robert Vedatsky, Esquire.**

**Civ. A. Nos. 91–0958, 91–0959.**

United States District Court,
E.D. Pennsylvania.

Feb. 25, 1992.

Stephen Raslavich, Philadelphia, Pa., for debtor and trustee.

John S. Trinsey, Jr., pro se.

Robert J. Vedatsky, pro se.

David Zalesne, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for James E. Beasley.

ORDER

LOUIS H. POLLAK, District Judge.

For the reasons stated from the bench on February 24, 1992, it is hereby ORDERED that the Bankruptcy Court's Order of Janu-ary 8, 1991, 121 B.R. 462 is REVERSED. This matter is remanded to the Bankruptcy Court for proceedings consistent with this Court's Bench Opinion.

**In re IMAGING EQUIPMENT SERVICES, Debtor.**

**IMAGING EQUIPMENT SERVICES, Plaintiff,**
v.
**William S. WITT, M.D., t/d/b/a Diagnostic Radiology, Defendant.**

**Bankruptcy No. 91–1149 JLC.
Adv. No. 91–0586.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 4, 1992.

Kenneth Steidl, Steidl & Steinberg, Larry E. Kemp, Pittsburgh, Pa., for debtor.

Irwin Venick, Woods & Venick, Nashville, Tenn., for defendant.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Chief Judge.

The instant adversarial proceeding is an action by Imaging Equipment Services, Inc. (Debtor) against Dr. William S. Witt, t/d/b/a Diagnostic Radiology (Defendant) for sums allegedly due for its post-petition servicing of Defendant's medical scanning equipment under a service contract. In his amended answer, the Defendant filed a counterclaim seeking to enforce a performance guarantee addendum to the service contract. Because of stipulations by the parties, only the Defendant's counterclaim is at issue.

### I. FACTS

The Debtor is a Pittsburgh, Pennsylvania corporation engaged in the repairing, maintaining and servicing of medical equipment. The Defendant owns and operates a medical practice in Nashville, Tennessee under the name Diagnostic Radiology. On October 23, 1989, the Debtor and the Defendant entered into a written service contract whereby the Debtor was to service and repair the Defendant's CT scanner as needed.[1]

The contract required the Debtor to be on call to service the Defendant's CT scanner 24 hours a day, 7 days a week. A flat monthly fee was charged regardless of the number of service calls required each month. However, not all CT scanner repairs were the responsibility of the Debtor under the service contract. The repairs not included were unauthorized upgrades, replacement of X-ray tubes, and other matters not under the Debtor's control such as power supply and air conditioning problems.

---

1. A Computed Tomography (CT) Scanner uses an extremely narrow x-ray beam which passes through a cross-section of the body or brain. This narrow beam is picked up by an electronic device and fed to a computer. The computer determines the exact density of the tissues that the x-rays have passed through and then prints out an illustration of that cross-section of the body which was scanned. The CT scanner functions as if one were to pass a piece of photographic film through a portion of the body. Only that layer of tissue which touched the film would be recorded.

The Defendant drafted and added a performance guarantee which was agreed to by the Debtor. The performance guarantee provided the Defendant with the right to call in an alternative service contractor should the Debtor not be able to return his equipment to full operating capacity within eight (8) hours, and to withhold part or all of the monthly fee if the Debtor did not maintain the Defendant's CT scanner in good operating condition. The performance guarantee, including the alterations of the parties, provides in pertinent part:

MONIES will be subtracted (withheld) from the contract if the contractor fails to meet the uptime requirements using the following formula:

| UPTIME | MONIES PAID |
|---|---|
| 97% | 100% |
| ~~96 to 95%~~ <97 to 96% | 90% |
| ~~94 to 93%~~ <96 to 95% | 80% |
| ~~92 to 91%~~ <95 to 94% | 60% |
| ~~90 to 89%~~ <94 to 93% | 40% |
| ~~88 to 87%~~ <93 to 92% | 20% |
| ~~86%~~ <92% | 0% |

The service contract expired on October 22, 1990. Thereafter, the parties orally agreed to operate under the terms of the 1989/1990 contract, but at a higher monthly fee. The parties have stipulated that this was a "new" contract. In any event, the Defendant continued to make full monthly payments in a timely manner without invoking the performance guarantee until June 22, 1991. An employee of the Defendant's did contact the Debtor in February 1991, and again in May 1991, concerning excess down-time due to disrepair, but the Defendant did not withhold the monthly fee.

On April 9, 1991, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The service contract with the Defendant was unaffected and the Debtor made several service calls until August 22, 1991. The Debtor filed the instant action on October 10, 1991, when the Defendant refused to pay the monthly fees for the periods June 23, through July 22, 1991, and July 23 through August 22, 1991.

In its original complaint, the Debtor alleged that the Defendant ended the service contract when he failed to pay the monthly fee due on June 22, 1991. As a result the parties began to operate on an expense basis. The Debtor claims that $54,726.73 was due for labor, parts, shipping costs, telephone and tax. At trial the parties stipulated that the Debtor would be limited to the flat monthly fee for the periods June 23 to August 22, 1991. This totals $12,808.00.

The Defendant filed his answer and then moved to amend it in order to include a counterclaim seeking recovery under the performance guarantee. Amendment was permitted and the counterclaim alleged that the Debtor owed the Defendant $34,000 for the contract period October 23, 1989 to October 22, 1990, and $174,000 for the contract period October 23, 1990 to August 22, 1991.

The Debtor raised an additional claim seeking the recovery of a motor controller and a disc controller. The Defendant objected to this claim as not being timely filed. Regardless, the disc controller was later discovered to be in the possession of the Debtor, and at trial [2] the Debtor agreed to accept the return the motor controller provided it was repairable condition.

## II. DISCUSSION

The original complaint filed by the Debtor alleged that the Defendant owed money. The Defendant does not contest this. Therefore, the only issues remaining are those stated in the Defendant's counterclaim; whether the Defendant is entitled to amounts due under the performance guarantee and whether the Defendant properly withheld the monthly payments due the Debtor.

This case is a core proceeding pursuant to 28 U.S.C. Section 157(b)(3) and this court will therefore make a final determination in this matter.

The Debtor asks that this court find the performance guarantee unconscionable. It

---

**2.** It is unclear from the pleadings whether the motor controller was actually returned and whether it was repairable.

argues that the performance guarantee is an unenforceable penalty provision which provides for a forfeiture of the Debtor's fee if the Defendant's CT scanner is "down" based upon arbitrary percentages. Debtor's Brief, p. 2. In the alternative, the Debtor contends that, even if the performance guarantee was enforceable, the Defendant waived his rights to collect for down-time due for all prior monthly periods. Debtor's Brief, p. 3.

■ A contract may be unconscionable in two ways. It may be unconscionable on the face of its terms or in the manner in which it is enforced. *See, Witmer v. Exxon Corp.*, 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981). While it is arguable that the performance guarantee is unconscionable by its very terms, this court does not agree that the terms themselves are necessarily unconscionable.

The Debtor has been in the business of servicing scanning equipment since 1985 and was not forced to deal with the Defendant under these terms. The Pennsylvania Supreme Court explained that:

The law demands that every man who bargains with another should do so only after due reflection of the possible consequences of his bargain and if he misjudge the consequences that could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy his fecklessness. Absent some legally recognized infringement of the law of contract by one party, the law will not reform a written contract so as to make a contract for the parties that they did not make between themselves and certainly never to rescue a party who did not reasonably foresee the consequences of his bargain.

*New Charter Coal Company v. McKee*, 411 Pa. 307, 312, 191 A.2d 830, 833 (1963).

In the case at bar, the Debtor was a willing and knowledgeable party. The Debtor bargained with the Defendant and certainly realized that the Defendant could withhold the entire monthly fee if its service resulted in down-time in excess of eight percent. Therefore, the Debtor cannot now argue that the service contract which it freely negotiated and entered into was unconscionable.

However, the performance guarantee may be unconscionable in the manner in which the Defendant is attempting to enforce it. The Defendant wants this court to construe the performance guarantee as a liquidated damage clause or a penalty provision. He relies on *Dept. of Transportation v. Interstate Contractors Supply*, 130 Pa.Cmwlth. 334, 568 A.2d 294, 295 (1990), which held that to determine whether a liquidated damage clause is an unenforceable penalty, one must examine the entire contract in light of its text, what it is about, the parties intentions, and the facility of measuring damages or the lack thereof, so as to arrive at an equitable conclusion.

The Defendant argues that the Debtor is not naive and has extensive experience in this field. The intent of the parties was to maintain the Defendant's equipment for maximum operation during peak scanning hours. The Defendant contracted with the Debtor because it represented that it could maintain the Defendant's scanning equipment at maximum operational capacity. The inability of the Defendant to perform a scan would result in actual and calculable losses. The Defendant demands that because of the parties' intent and the inability to accurately calculate losses, the liquid damages provision (performance guarantee) should be enforced. Defendant's Brief, p. 4.

This court's examination of the performance guarantee revealed that it was not intended as a liquidated damage clause or penalty provision. Rather, the performance guarantee was to provide the Debtor with timely notice of service problems and to insure that the Debtor would have an incentive to properly and promptly service the Defendant's medical scanning equipment. The Defendant was permitted to withhold certain specific amounts of the monthly fee if the CT scanner did not operate for a certain amount of time. The Debtor would certainly be stimulated to

improve its service for the next period if it wanted to receive the full monthly fee.

■ By not invoking the performance guarantee promptly, the Defendant allowed the Debtor to rightfully believe that its services were acceptable and that monies received were due and owing to the Defendant. It would be unconscionable to allow the Defendant to wait several months before off-setting or collecting all of his down-time at one time. If such a practice was permitted, the debtor would have been insolvent months before bankruptcy and would not have known it. The Debtor could owe the Defendant, or any other customer with a similar service agreement, unknown amounts of money that could potentially be collected in lump-sums, months or years later. Such a practice could not have been the contemplation of the Debtor at the time the service contract was entered into.

■ The Defendant should have deducted the down-time from the monthly fee due for that period when it was due. The conduct of the party's to a contract may expressly or impliedly waive a parties rights under the contract as long as the intent to waive may be reasonably inferred. *See, Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214 (1989); *In re: Schnur Enter.*, 42 B.R. 202 (Bankr.W.D.Pa.1984).

Here, the Defendant expressly waived his rights to collect down-time owed under the 1989/1990 contract when he entered into the "new" contract. He then allowed the "new" oral contract to operate for almost four more months without making any objection about excess down-time. Therefore, the Defendant, by his inaction, impliedly waived his right to invoke the down-time for this period.

February 1991, was the first time the Defendant complained of poor service and excess down-time. He again contacted the Debtor about excess down-time in May, 1991. However, in both instances, he did so in a manner which minimized the seriousness of the problem because he did not withhold payment as permitted under the performance guarantee. Therefore, it is the conclusion of the court that the Defendant waived his right to collect the down-time for the periods up to June 22, 1991.

It was not until July and August 1991 that the Defendant properly exercised his rights under the performance guarantee. He alleges that he experienced 42% down-time for July 1991 and 55% down-time for August 1991. The Defendant bases these calculations on scanning logs that were maintained by his chief technologist and correlated to the field service reports which were prepared by the field service engineer who serviced his equipment. The Debtor contests the Defendant's calculation and alleges that a significant amount of down-time was created by items excluded under the service contract. Even so, the Defendant may withhold full payment if the down-time exceeds eight percent under the performance guarantee. This court finds that the down-time for June 23, 1991 to August 22, 1991, exceeded eight percent and that the Defendant rightfully withheld the monthly fees for those periods.

As a final matter, both parties raise allegations as to the Debtor's claim for damages to a motor controller. At trial the parties agreed that the Debtor would accept return the motor controller provided it was repairable. Therefore, the Debtor's claim for the motor controller is dismissed without prejudice provided that the Defendant returns the motor controller in a repairable condition.

## III. CONCLUSION

This court finds that the Defendant waived his right to collect "down-time" under the performance guarantee of the service contract for the periods of time between October 1989 and June 22, 1991. The Defendant rightfully withheld monthly fees owed the Debtor for services provided from June 23, 1991, to August 23, 1991 because the "down-time" experienced by the Defendant exceeded the eight percent level under the performance guarantee of the service contract.